UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| JAMES W. SWARNES, | ) | CIV. 08-5025-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING |
| | ) | DECISION OF |
| MICHAEL J. ASTRUE, | ) | COMMISSIONER |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, James Swarnes, moves the court for reversal of the
Commissioner of Social Security's (Commissioner) decision denying his
application for disability insurance benefits and supplemental security
income under Titles II and XVI of the Social Security Act. The
Commissioner opposes the motion. The court affirms.

**PROCEDURAL BACKGROUND**

On November 3, 2004, James Swarnes protectively filed applications
for Disability Insurance Benefits and Supplemental Security Income
payments, alleging disability since January 1, 2003. AR 120. Swarnes's
attorney filed a written motion to amend the disability onset date to
March 4, 2003, and the motion was granted. AR 229. Swarnes alleged that
he became disabled due to herniated discs in his neck, status post cervical
fusion surgery, and an alleged inability to use his left arm. AR 168. Both

claims were denied initially and on reconsideration. AR 88-90, 78-79. Subsequently, on June 20, 2005, Swarnes filed a request for a hearing, which was held on May 22, 2006, in Rapid City, South Dakota. AR 76, 667A.[1] On August 22, 2006, the Administrative Law Judge (ALJ) issued a written decision determining that Swarnes was not under a disability as defined in the Social Security Act and that he was not entitled to Disability Insurance Benefits or eligible for Supplemental Security Income payments. AR 537-547.

Swarnes filed a request for review of the ALJ's decision and on December 22, 2006, the Appeals Council granted Swarnes's request, vacated the hearing decision, and remanded the case to an ALJ for further proceedings. AR 530-533. As a result, on April 18, 2007, the ALJ held a supplemental hearing in Rapid City, South Dakota. AR 696.[2] Upon discovering that Swarnes was scheduled for surgery the following week, the ALJ continued the hearing until those records could be obtained. AR 706-708. Accordingly, on June 1, 2007, another hearing was held in Rapid City,

---

[1] Swarnes, Dr. Ronald Houston, an independent psychological vocational expert, and William Tysdal, an independent vocational expert, testified at the hearing. AR 667A-695.

[2] Swarnes and Dr. Michael Enright, an independent psychological medical expert, testified at the hearing. AR 696-709.

South Dakota.  AR 710.[3]  On July 19, 2007, the ALJ issued a decision

finding Swarnes had not been under a disability within the meaning of the

Social Security Act since March 4, 2003, and consequently was not entitled

to Disability Insurance Benefits or Supplemental Security Income payments.

AR 20-36.  The Appeals Council denied Swarnes's request to review the

ALJ's decision on January 23, 2008.  AR 11.[4]  This appeal followed.

## FACTUAL BACKGROUND

Swarnes was born on August 24, 1960, making him 42 years old on

the alleged disability onset date and 46 years old at the time of the ALJ's

second decision.  AR 124.  He completed twelfth grade in 1978.  AR 174.  He

is married, and he and his wife have children living with them.  AR 124-125.

He worked from 1978 until 2003 as a machine operator at a rock

quarry, which required him to unload barges with cranes, load dump trucks

with sand or rock, and drive a big dump truck.  This job also required him

to use machines, tools, and equipment as well as technical knowledge and

---

[3] Swarnes, Dr. Jerry Atkin, an independent psychological medical expert, and Jerry Gravatt, an independent vocational expert, testified at the hearing. AR 710-731.

[4] When reviewing the ALJ's July 19, 2007, decision, the Appeals Council considered a memorandum from Swarnes's attorney in addition to the record. AR 15.

skills. AR 169. This job ended in September 2003. AR 196.[5] Additionally, he has completed special job training; he received a pilot's license for a tug boat in 1982, which has expired. AR 174.

Swarnes's extensive pertinent medical treatment history begins on March 3, 2003, when he went to the Emergency Department of Pike County Memorial Hospital in Louisiana, Missouri. Dr. Robert Glass opined that Swarnes had cervical radiculitis, applied an injection of Toradol, and referred Swarnes to physical therapy. AR 376. A physical therapist examined Swarnes, and Swarnes began a program of cervical traction. AR 360. Approximately three weeks later, on March 24, 2003, Swarnes returned to the emergency room due to increasing pain and an inability to move his left arm because of pain, and he was referred to a neurosurgical clinic. AR 276-277.[6]

Almost a month later, on April 15, 2003, Swarnes saw Dr. Krettek, who reported that an MRI scan revealed spinal abnormalities at multiple levels in Swarnes's neck. AR 425. On April 21, 2003, a cervical myelogram

---

[5] Swarnes earned wages in January, February, March, and September 2003, but he did not earn any wages in 2004. AR 194-195. Further, his employer never provided a subsidy, which is when an employer willingly pays more in wages than the value of the actual services. AR 190-193.

[6] The doctor reported that x-rays of the shoulder and humerus were negative for any fracture or dislocation. An MRI showed C3 and C4 mild to moderate purfusion and C5-6 mild to moderate herniation laterally and centrally with some slight impingement. AR 277.

demonstrated left C5-6 disk herniation, and on April 22, Swarnes underwent an anterior cervical diskectomy interbody fusion surgery. AR 293, 416-418. Swarnes improved after this surgery, and on September 2, 2003, Dr. Krettek released Swarnes to work, with the following restrictions: "limited work above shoulder level," "no machines that jerk his head around," "allowed to run newer cranes that do not have this jerking motion," and no operating "front loaders, payloaders and dump trucks." AR 293, 409, 411, 413. Swarnes returned to work on September 2, 2003, but ten days later, he experienced neck pain, a headache, bilateral shoulder pain, and low back pain. As a result, on September 18, 2003, Dr. Krettek saw Swarnes and placed him on temporary total disability. AR 406.

On October 9, 2003, Dr. Krettek stated that Swarnes continued to have neck pain and limited neck range of motion. Because there was no light duty at work, Swarnes continued on temporary total disability. Dr. Krettek began cervical traction. AR 402. One month later, on November 10, 2003, Dr. Krettek reported that Swarnes continued to have headaches, neck pain, and shoulder pain, but he noted that there was no evidence of additional anatomic lesion that would require surgery. AR 401. Dr. Krettek recommended an evaluation for pain management, and on November 17, 2003, Swarnes saw Dr. Bakul Daye. AR 401, 254. Dr. Daye stated that Swarnes reported that his pain was getting worse since his re-

injury in September 2003.  Dr. Daye noted that Swarnes was having a hard time lifting his head backward or turning sideways without significant neck pain and recommended that Swarnes get a bone/SPECT scan.  AR 254.  Over a month later, on December 30, 2003, Dr. Krettek reported that Swarnes had limited neck motion and increased pain on looking up or looking to either side.  AR 390.

On January 19, 2004, Dr. Krettek opined that Swarnes had reached maximum medical improvement, had a permanent partial disability of 25 percent directly related to the cervical spine, and was totally disabled for his own occupation.  AR 389.  On February 9, 2004, in a Disability Report form, Swarnes reported that his ability to work was limited; he had no use of his left arm, neck problems, and a herniated disc fusion.  AR 168, 175.  He further complained that he could not move his neck, that he got headaches, that his left arm was weaker, and that he could not sit for very long.  AR 168-169.

On February 20, 2004, Swarnes's sister, Margaret Blackwell, completed a form about Swarnes's disability claim for him.  AR 201.  The report indicated that Swarnes did not use a cane, crutches, walker, wheelchair, artificial limb, hearing aid, phone amplifier, or oxygen.  He was able to pay bills, use a checkbook, and count change.  He did laundry, dishes, banking, and went to the post office.  He could not make a bed or

change sheets, iron, vacuum or sweep, take out the trash, engage in home repairs, participate in car maintenance, mow the lawn, rake leaves, or work in a garden. He could watch a two-hour movie but had to take a break to get up and stretch. He had a valid driver's license and could drive but had trouble driving because he could not turn his neck. If he drove, he went to the store and back twice a week, which was a total of four miles, and no one had advised him not to drive. He did not have difficulty leaving his home and left his home about twice a week for short periods of time. He was irritable about the fact that he could not do anything without experiencing pain. AR 198-201.

On March 19, 2004, a state agency physician filed out a physical residual functional capacity assessment. He determined that Swarnes could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk with normal breaks for about 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour day, and push and/or pull with limitations in the upper extremities. Further, Swarnes could frequently climb ramps and stairs, balance, stoop, kneel, and crouch. He could occasionally climb ladders, ropes, and scaffolds. The state agency physician also noted that the physical residual functional capacity assessment was not significantly different from any limitations placed on Swarnes by his treating physicians. AR 243-251.

On June 26, 2004, Dr. Jeffrey Magrowski, a vocational rehabilitation counselor, assessed Swarnes's vocational potential.  Dr. Magrowski concluded that Swarnes was unemployable based upon his interview with Swarnes, Swarnes's spouse, and his review of medical records.  AR 476. Dr. Magrowski found that there was an indication that Swarnes required low back surgery, that Swarnes needed to lie down for pain relief, and that test scores indicated that Swarnes had an IQ of 77, which is within the borderline mentally handicapped range.  AR 476.  He indicated that Swarnes had skills that would transfer to light work but that such jobs would require head movement and may expose a worker to vibrations.  AR 474-477.

Almost six months later, on December 21, 2004, Swarnes's wife completed a third-party function report.  She reported that she sometimes had to put socks and shoes on Swarnes, but that Swarnes's condition had not affected his ability to bathe, shave, feed himself, care for his hair, or use the toilet.  She stated that Swarnes folded laundry once or twice a week and that he could go out alone but was scared to drive because he could not turn his neck.  She reported he went shopping for milk or bread, and his shopping trips usually lasted 15 to 20 minutes.  He was able to count change, but not able to pay bills, handle a savings account, or use a checkbook because he did not understand.  She also noted that Swarnes's

condition had affected lifting, squatting, bending, standing, walking, sitting, hearing, seeing, stair-climbing, understanding, and getting along with others. AR 202-209. On that same day, Swarnes filled out a function report. He reported he was unable to work, have sex on a regular basis, dance, hunt, fish, or play cards because of his medical condition. He stated that his wife had to put on his pants, socks, and shoes if he was too sore but he did not need assistance to bathe, shave, feed himself, care for his hair, or use the toilet. He tried to dust and fold clothes, and he did drive but his wife did most of the driving because he could not turn around to check for cars. He went shopping for anything his wife forgot or cigarettes, and his shopping excursions lasted for 10 to 15 minutes. He reported that he was unable to pay bills, handle a savings account, or use a checkbook because he is not very smart with these things. He indicated that he could not lift, squat, bend, stand, walk, sit, kneel, hear, climb stairs, see, concentrate, or understand because he needed to get his lower back fixed. AR 210-217.

Almost one year after his last medical visit, on February 14, 2005, Swarnes presented at the Emergency Department in Rapid City Regional Hospital for severe low back pain. The doctor ordered a morphine shot and IV and an MRI of his lumbar spine. AR 457. On February 16, 2005, Swarnes attended a consultative evaluation with Dr. Dave Johnson, which

was arranged by the State Disability Determination Services (DDS).
Dr. Johnson determined that Swarnes had experienced chronic neck pain
since his cervical fusion in 2003. Swarnes told Dr. Johnson that lifting over
20 pounds, standing more than one and one-half hours, walking more than
two blocks, and sitting more than 15 minutes bothered him. Dr. Johnson
noted that the neck exam showed Swarnes was hesitant to move his neck in
any direction and that there may have been some muscle spasm and
tenderness in that area. Dr. Johnson did not make any conclusions
regarding permanent physical limitations, but Dr. Johnson did recommend
more intensive physical therapy in addition to muscle relaxants, massage,
heat, and possible diathermy, prior to a determination of any permanent
limitations. AR 479-481. On February 22, 2005, Swarnes presented at
Regional Neurosurgery and Spine Clinic. He described low back pain and
numbness in his left leg and foot. He also reported several episodes in
which his left leg just "gave out," and stated that lying down helped his
pain, that walking aggravated the pain, and that when sitting he had to use
his arms to support himself. AR 472.

On March 11, 2005, a medical consultant filled out a physical
residual functional capacity assessment. Subsequently, on May 10, 2005,
this report was reviewed by Dr. Greg Erickson, who supplemented the
evidence relied upon by the medical consultant with the updated MRI/CT

reports, pain reports, and procedure from April 15, 2005. AR 235-242. It was determined that Swarnes could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour day, and push or pull without limitations. Additionally, Swarnes could occasionally climb stairs or ladders, balance, stoop, kneel, crouch, and crawl. Finally, he opined that Swarnes had no manipulative, visual, communicative, or environmental limitations. Also, the medical consultant noted no treating or examining physician's statement regarding Swarnes's physical capacities existed in the file. AR 236-242. Also in March 2005, Dr. Krettek stated that Swarnes was 100 percent disabled from his own occupation as of December 30, 2003, but that he could not assess any of his current limitations because he had not seen Swarnes for over one year. AR 478.

On April 15, 2005, Swarnes sought treatment at the Regional Pain Management Center for back pain extending down his left lower extremity. Dr. Frost administered bilateral L4-5 facet injections. AR 440-441. One month later, on May 17, 2005, Swarnes went to the emergency room, complaining of low back pain and was given morphine. AR 433. On May 27, 2005, Swarnes presented at the Rapid City Community Health Clinic for depression. AR 511.

On July 14, 2005, Swarnes received a bilateral L4-5 and L5-S1 facet rhizotomy and median nerve block at the Regional Pain Management Center.  AR 488.  On July 17, 2005, Swarnes saw Dr. John Lassegard at the Rapid City Community Health Center for depression, breathing problems, anxiety, back pain, and disability issues.  AR 510.  On July 20, 2005, Dr. Lassegard completed an assessment of Swarnes's functional abilities. Dr. Lassegard opined that Swarnes could not work; needed to lie down frequently throughout the day; could lift up to 10 pounds occasionally; sit 30 minutes to one hour at a time; stand 15 to 20 minutes at a time; occasionally reach and balance; never climb ladders, crouch, kneel, or crawl; understand simple instructions; and needed to avoid exposure to moving mechanical parts, humidity, dust, fumes, and extreme temperatures, but could tolerate exposure to vibrations.  AR 506-508.

On September 8, 2005, Swarnes reported that although the July 2005 rhizotomy had helped his back pain for two months, his low back pain was reoccurring.  AR 521.  On October 6, 2005, Dr. Eichler reported that although he did not perform disability evaluations, Swarnes "appeared significantly disabled . . . because of his back pain and facet disease."  AR 502.  On December 24 and 30, 2005, Swarnes contacted the Regional Pain Center seeking additional treatment for his pain but was told to contact the billing department to make arrangements for payment of previous care.  AR

498-499.

On February 3, 2006, Swarnes presented for an appointment with Dr. Jay Schindler at the Regional Neurosurgery and Spine Clinic. Swarnes waited for one hour but had to leave because he was in pain. AR 520. On February 6, 2006, Swarnes saw Dr. Schindler at the rescheduled appointment, and Dr. Schindler advised Swarnes that he did not have a surgical solution or a neurological rationale for his pain. Dr. Schindler referred Swarnes back to Dr. Frost because Dr. Frost had provided him successful treatment in the past. AR 514.

The first administrative hearing in this matter was held on May 22, 2006. AR 669-695. Swarnes testified that he was in very much pain. He stated Vicodin helps relieve the pain "a little bit," that Cymbalta helps his depression, and that he had no side effects from these medications. AR 677-678. He testified that his neck and back hurt and that the pain goes down to his lower left leg. He also explained that if he stood up for too long, his left leg went numb. On average his pain was a five or six, although it could be an eight or ten. He had not gone to the emergency room for shots of Demerol or other pain relievers. In addition to medication, Swarnes used a heating pad and an ice pack. He did not see any mental health professionals. AR 678-679. He further testified that he did not have a driver's license and that the last time he had a valid license was in 2001.

He explained that he received a DWI and, as a result, his license was revoked for three years. He reported driving very seldom, but he took a trip with his wife to get his niece's children and he thought he drove about 150 miles of the 1800-mile excursion. AR 680-681.

Swarnes also testified that on a typical day, he got up at about 7:30 a.m., fixed bowls of cereal for the children, washed the bowls, and laid on the couch and watched TV. He fixed lunch for himself and the children and then laid down on the couch and watched TV. AR 682. He was able to dress himself, and he usually wore sweat pants, button up shirts, and slip-on shoes. He could brush his teeth, comb his hair, and shave. He did not go grocery shopping unless it was an emergency. He did not help with the laundry and did not help pick up around the house. He did not water the lawn, rake, mow, exercise, swim, or stretch. He did not go to any social activities and every once in a while he would go to the bar where his wife worked to have a beer and socialize. AR 681-685.

In relation to his physical limitations, Swarnes noted that he could sit for about 30 minutes and could stand for about fifteen minutes. He could not lift over 10 pounds and could carry only a box of Kleenex to the other side of the room. He was able to handle and manipulate things, but he had difficulties with his arms and shoulders. He could not reach very high because it pulled on his back and neck. He had trouble with his balance

and was prescribed a cane by Dr. Eichler. AR 686-687. On August 22, 2006, the ALJ issued his decision, concluding that Swarnes was not disabled. AR 537-547.

Swarnes continued to seek treatment at the Rapid City Community Health Center. On August 2, 2006, Dr. Lassegard reported that Swarnes continued to have back pain extending to his left lower extremity. He further noted that Swarnes had difficulty bending and that his lumbar muscles were tense and flat. AR 638. On November 11, 2006, Dr. Lassegard reported that Swarnes's back pain continued and that he did not do well on the toe walk or the heel walk because of pain in his back and problems with balance. AR 636. On December 15, 2006, Dr. Lassegard reported that Swarnes had degenerative lumbar disks at the L3-4, L4-5 levels, arthritis in the facet joints throughout his lumbar spine, and a nerve root tumor seen on an MRI of his lumbar spine. Dr. Lassegard reported that Swarnes had back pain that limited his ability to bend and lift and that caused him to remain in bed most of the day. Dr. Lassegard also noted that Swarnes's access to medications and surgical care had been limited because of his finances and that due to his medical conditions, Swarnes had been unable to work. AR 622. On December 21, 2006, Swarnes saw Dr. Schindler, complaining of low back pain and left lower extremity discomfort when walking. Dr. Schindler opined that Swarnes's stenosis at

L4-5 and L3-4 might be contributing to Swarnes's low back pain. Further, Dr. Schindler opined that Swarnes's low back dysfunction might be secondary to the prior facet rhizotomies that had stopped providing benefit after three months. AR 626.

On January 25, 2007, Swarnes saw Dr. Schindler, who reported that Swarnes remained neurologically intact but was limited due to pain caused by L4 and L5 distributions on his left side. AR 624. Dr. Schindler advised of both conservative and surgical options. Swarnes indicated that he did not want to pursue the conservative options because he did not like the risk/benefit ratio considerations. Dr. Schindler opined that Swarnes might be a candidate for a newer surgical procedure in which dowels are placed in the facet joints as a posterolateral fusion technique. AR 624. On April 12, 2007, Dr. Schindler reported that Swarnes was scheduled for facet fusion of L3-4 and L4-5 on April 24, 2007, and that Swarnes was looking forward to " 'the chance' to reduce his severe back pain and significant radicular pain." AR 642. Also, in April 2007, Swarnes's wife wrote a letter to his attorney stating that Swarnes sometimes had difficulty caring for his personal needs due to difficulty reaching and walking. AR 611-614.

The second administrative hearing in this matter began on April 18, 2007. AR 698-709. Dr. Enright, a clinical psychologist, testified. After reviewing the file, Dr. Enright had sufficient objective medical evidence to

allow him to form an opinion with regard to Swarnes's claim. Dr. Enright opined that from the mental health standpoint, the record does not demonstrate that Swarnes had any limitations in the work setting. AR 699-700. Swarnes testified that he lived with his wife and three children, twins who are 15 and the youngest at 14. He did not have any current income and his wife worked full-time outside the home as a manager of a bar. His disability is caused by his back, neck, and headaches. He has had one operation on his neck in 2003, and one operation on his back in 2004. He was scheduled for another back surgery where the doctors will put some kind of bone in between his facet joints. The result of the surgery is to take the pressure off of his legs where he had numbness after standing for a period of time. After the ALJ discovered that Swarnes was to undergo surgery, the ALJ postponed the hearing until after Swarnes's surgery. AR 702- 707.

On April 24, 2007, Swarnes underwent the TruFuse procedure with facet fusions at L3-4 and L4-5. AR 643. On that same day, Dr. Schindler wrote a letter to Dr. Lassegard regarding Swarnes. Dr. Schindler informed Dr. Lassegard that he had performed bilateral laminotomies at L-3-4 and L-4-5 in addition to facet fusions at those levels bilaterally. AR 646. About two weeks later, on May 9, 2007, Dr. Schindler reported that Swarnes was doing much better and that Swarnes was walking without a cane.

Dr. Schindler noted that Swarnes should gently increase his activity level. Dr. Schindler also recommended that because of surgery, Swarnes should pursue a gently aggressive course of repetitive ambulation and physical therapy while avoiding activities that might require heavy and/or repetitive bending, squatting, twisting, stooping, or lifting more than 10 pounds. AR 657. About a week later, on May 18, 2007, Dr. Schindler reported that Swarnes had a recurrence of back pain. Swarnes had been feeling better until he twisted wrong getting out of bed. Dr. Schindler advised Swarnes to stop smoking and noted that he would like to see Swarnes get a bone growth stimulator but that Swarnes continued to be uninsured. AR 656.

The second administrative hearing resumed on June 1, 2007. AR 712-731. Dr. Atkins, a clinical psychologist, testified. He reviewed the file and determined that there was sufficient objective medical evidence in the record to allow him to form an opinion with regard to Swarnes's mental status. Dr. Atkins opined that he did not think Swarnes had any substantial limitations solely on the basis of mental health issues. AR 713-714.

Swarnes testified that he is taking three prescription drugs: Effexor, Flexeril, and Percocet.[7] The medications help and do not cause him to have

_____

[7] Swarnes also testified that he sometimes takes Vicodin in lieu of Percocet. AR 716.

any side effects.  AR 715-716.  Currently, he does not have a driver's license because he lost it due to a DWI, but his health has also prevented him from trying to get it back.  He only drives in the case of an emergency.  AR 715-717.  On an average day, he gets up, eats breakfast, walks about 50 yards to the mailbox, walks back to the house, and lies down.  He fixes himself a sandwich for lunch, walks out into the backyard, and usually just lays down and watches TV.  He does not help prepare dinner and after dinner, he watches TV.  He sleeps an average of four hours and does not take anything to help him sleep.  On the weekends, he might ride to town with his wife when she goes to work and go visit his father-in-law and friends.  AR 718-720.

Additionally, Swarnes testified that he dresses himself, puts on his own shoes and socks, brushes his teeth, combs his hair, and shaves.  He does not do any grocery shopping, but sometimes he goes with his wife and sits in the car.  He washes a few dishes but has to sit down.  He does not help with the laundry, any other housekeeping duties, or yard work.  His doctor told him that walking is his best therapy so he walks around the block.  He does not go to church or attend any social activities.  AR 720-722.

Swarnes also testified that if he can move around and shift his position while he is sitting, he can remain seated for 30 minutes.  If he can

move around and shift his weight while he is standing, he can stand for 15 or 20 minutes. He can walk half of a block before he has to stop and take a break, can lift a gallon of milk, and can carry a box of Kleenex across the room. He is able to hold onto things, uses a cane for balance, can walk up and down stairs with handrails, cannot stoop down, can reach for things in front of him, and cannot reach overhead. He lies down to relieve the pain and he has to lie down about every couple of hours for about one hour. He gets a severe headache almost every morning. AR 722-726.

Jerry Gravatt, a vocational specialist, testified that he reviewed the file and listened to the hearing testimony. In Gravatt's opinion, there would be work available for an individual of Swarnes's age, education, and past work experience that is limited to work at the sedentary level, that can occasionally lift or carry 10 pounds, frequently lift or carry less than that, can stand and/or walk with normal breaks for about four hours in an 8-hour workday, can sit with normal breaks for about six hours in an 8-hour workday, and that can alternate between sitting or standing and walking every 30 to 45 minutes if need be. An individual with such limitations could work as a call-out operator and such sedentary, unskilled work is available regionally and nationally. AR 727.[8] Gravatt further testified that an

---

[8] Gravatt also testified that there are jobs that exist in significant numbers in the national or regional economy for an individual who could occasionally lift or carry 20 pounds and could frequently lift or carry 10

individual who had to lie down every two hours for about an hour at a time because of pain was not employable within the terms of the Social Security Act and there would be no jobs available to that individual. AR 730.

## ALJ DECISION

On July 19, 2007, the ALJ issued a decision finding that Swarnes had not been under a disability within the meaning of the Social Security Act from March 4, 2003, through the date of his decision. AR 20-36. The ALJ outlined the five-step sequential evaluation process for determining whether an individual is disabled and elaborated on what needed to be considered at each step of the analysis. AR 21-25.[9]

At step one, the ALJ determined that Swarnes had not been engaged in substantial gainful activity since March 4, 2003, the amended alleged

---

pounds in addition to the limitations listed above. Such work includes a garment sorter. AR 729.

    [9] "To determine disability, the Commissioner uses the familiar five-step sequential evaluation, [and] determines: (1) whether the claimant is presently engaged in a 'substantial gainful activity'; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform." Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998) (internal footnote omitted).

onset date of his disability. At step two, the ALJ found that Swarnes had a history of degenerative disc disease and fusion and chronic pulmonary disease which were impairments considered to be "severe" under the Social Security Regulations. But the ALJ noted that Swarnes did not have any mental impairment which was considered to be "severe" under the Social Security Regulations. At step three, the ALJ found that Swarnes did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security Regulations. AR 26-28.

The ALJ next determined Swarnes's residual functional capacity (RFC). The ALJ found that Swarnes retained the RFC "to lift and carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk for about 4 hours in an 8-hour workday, [and] sit for about 6 hours in an 8-hour workday, [with the ability] to alternate between sitting and standing/walking every 30 to 45 minutes if need be." AR 28. He further noted that Swarnes's "ability to push/pull is limited to the same level as lifting and carrying [and he] can occasionally climb stairs and steps." AR 28. He further found that Swarnes "should not be required to climb ladders or scaffolds, [that he could] occasionally balance, stoop, kneel, crouch, crawl, bend, and twist, [and that he could] occasionally reach overhead with either arm." AR 28. Swarnes "should not be subjected to concentrated

exposure to extreme heat, extreme cold, dampness and humidity, noise, and vibration, and should not be subjected to hazards of the workplace." AR 28.

In determining Swarnes's RFC, the ALJ found Swarnes's allegations regarding his physical limitations were not completely credible. AR 29-35. Based on his RFC determinations, the ALJ concluded that Swarnes was unable to perform any past relevant work. AR 35. But after considering Swarnes's age, education, work experience, and his RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Swarnes could perform. AR 35. As a result, the ALJ terminated his analysis at step five and concluded that Swarnes was not entitled to disability benefits. AR 36.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if substantial evidence in the record supports it as a whole. 42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995). Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the

record which fairly detracts from the decision.  <u>Brockman v. Sullivan</u>, 987 F.2d 1344, 1346 (8th Cir. 1993); <u>Locher v. Sullivan</u>, 968 F.2d 725, 727 (8th Cir. 1992); <u>Turley v. Sullivan</u>, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. <u>Murphy v. Sullivan</u>, 953 F.2d 383, 384 (8th Cir. 1992).  Further, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."  <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993); <u>see also</u> <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993).  The court must review the Commissioner's decision to determine if an error of law has been committed.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); <u>Nettles v. Schweiker</u>, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  <u>Smith v. Sullivan</u>, 982 F.2d at 311; <u>Satterfield v. Mathews</u>, 483 F. Supp. 20, 22 (E.D. Ark. 1979), <u>aff'd per curiam</u>, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. <u>Smith v. Shalala</u>, 987 F.2d at 1374.

## DISCUSSION

## I.    Credibility Determination

An ALJ must determine the credibility of a claimant's subjective complaints of pain according to the analytical framework developed in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  In determining the proper weight attributable to a claimant's subjective complaints, the ALJ must consider several factors:  "(1) the claimant's daily activities; (2) the duration, frequency and intensity of pain; (3) the dosage, effectiveness and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004); see also Polaski, 739 F.3d at 1322.  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999).  The ALJ does not have to explicitly discuss each factor so long as the ALJ "acknowledges and considers those factors before discounting a claimant's subjective complaints."  Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005).

The ALJ "may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole."  Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).  The ALJ is expected, however, "to 'detail the reasons for discrediting the testimony and set forth the inconsistencies

found.'" <u>Gulliams v. Barnhart</u>, 393 F.3d 798, 802 (8th Cir. 2005) (quoting

<u>Lewis v. Barnhart</u>, 353 F.3d 642, 647 (8th Cir. 2003)).

**A.      Lack of Discussion of Evidence**

Swarnes argues that the ALJ improperly evaluated his subjective

allegations because the ALJ ignored substantial evidence supporting his

testimony.  More specifically, Swarnes maintains that the ALJ failed to

consider a December 21, 2004, third-party function report completed by his

wife; a April 16, 2007, letter from his wife; and an October 6, 2005,

statement by Dr. Marc Eichler.  Swarnes further alleges that the ALJ

ignored evidence that fully supported his testimony as to the severity of his

pain, including statements made by him that indicated he was anxious to

be alleviated from his severe back pain.

The ALJ did not explicitly refer to the report and letter submitted by

Swarnes's wife or the statement made by Dr. Eichler.  But his does not

mean that the ALJ did not consider such evidence.  "Although required to

develop the record fully and fairly, an ALJ is not required to discuss all the

evidence submitted, and an ALJ's failure to cite specific evidence does not

indicate that it was not considered." <u>Craig v. Apfel</u>, 212 F.3d 433, 436 (8th

Cir. 2000).  Accordingly, the fact that the ALJ failed to mention the above

evidence does not mean that such documents did not factor into his

decision.

Further, any failure by the ALJ to explicitly accept or reject Swarnes's wife's report and letter is not reversible error. Swarnes's wife's written materials corroborate Swarnes's report and testimony and therefore the ALJ implicitly found his wife's testimony was not credible. While a lay witness's testimony or statements should generally not be ignored without comments, an ALJ's failure to explain his rejection of such testimony constitutes harmless error when that testimony does little more than corroborate other testimony and adds nothing of substance to the record. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

Similarly, any failure by the ALJ to specifically discuss Dr. Eichler's comment that Swarnes looked disabled was harmless error. It is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements. Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996). Here, Dr. Eichler admits that he is not qualified to give a disability determination. Accordingly, this statement was a conclusory statement not supported by any basis in medical certainty. In any event, no deference is owed to Dr. Eichler's statement that Swarnes appeared to be "disabled." A statement by a doctor that an individual is "disabled" does not constitute a determination of disability within the meaning of the Social Security Act. A determination of disability is a legal determination, not a medical

determination.  As such, to receive federal disability, an applicant must be "disabled" within the meaning of the law.  See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).  Thus, the ALJ had no obligation to give deference to Dr. Eichler's statement.

Finally, the failure of the ALJ to mention that Swarnes was anxious to be alleviated from back pain does not require reversal of the ALJ's decision. The court is unaware and the parties have not cited any authority that requires the ALJ to consider and discuss the demeanor of the claimant in relation to receiving medical treatment.  Accordingly, even if the ALJ did not consider Swarnes's statements or reaction in response to treatment options, this is not reversible error.

**B.      Swarnes's Activities**

Swarnes maintains that the ALJ improperly asserted that his daily activities were inconsistent with his allegations of severe pain.  Swarnes argues that he reported minimal activities with frequent periods of lying down on an average day and that nothing in the record contradicts that testimony.  Swarnes also argues that the ALJ's statement that Swarnes "spends 6 to 12 hours a day at his wife's workplace" is not supported.

The ALJ expressly relied on three inconsistencies to find that Swarnes's daily activities were inconsistent with his allegations of pain. First, the ALJ emphasized that Swarnes made inconsistent statements

relating to his ability to drive.[10]  The ALJ emphasized that at the June 2007

hearing, Swarnes testified that in the past three and a half years he had

driven a car only in the case of emergency.  The ALJ pointed out that

contrary to this statement, at the May 2006 hearing, Swarnes had testified

that he took a trip to Missouri with his wife to pick up his niece's three

children in December 2005 and that he drove 150 miles of the 1800-mile

trip.  The ALJ further relied on the fact that Swarnes failed to explain how

his family moved from Missouri to South Dakota in 2004.  AR 30.

Second, the ALJ found that Swarnes was not credible because his

allegations of pain were inconsistent with his daily activities.  The ALJ

explained that Swarnes testified at the May 2006 hearing that he was caring

for children, ages 2, 3, and 4 and that such daily activity was not

compatible with Swarnes's subjective pain complaints.  The ALJ also

considered Swarnes's testimony at the May 2006 hearing about his average

day.  Swarnes testified that he woke up at 7:30 a.m., got the three children

breakfast, laid on the couch and watched TV, washed dishes by hand, and

read to the young children.  Then, he prepared lunch, washed dishes, and

_____

[10] The ALJ also noted that Swarnes made inconsistent statements about
whether he had a valid driver's license and found that this was another reason
he did not find Swarnes credible.  The ALJ noted that Swarnes had testified
that his driver's license was revoked in 2001 because of a DWI but that
Swarnes had told Dr. Magrowski in 2004 that he did in fact have a driver's
license.

watched TV.  After dinner, he watched TV until going to bed.  The ALJ found that these daily activities were inconsistent with Swarnes's allegations of pain.  Moreover, the ALJ determined that Swarnes's representations regarding his physical activities were not consistent and therefore served as a basis to support Swarnes's lack of credibility.  The ALJ noted that at the May 2006 hearing, Swarnes testified that he did the dishes after the meals but that during the July 2007 hearing he could only do a few dishes at a time.  The ALJ emphasized that Swarnes had a decreased ability to wash dishes even after his surgery, which he reported made him feel better.

Finally, the ALJ found Swarnes's trips outside the home were inconsistent with his complaints of pain.  The ALJ considered Swarnes's testimony that he does not go grocery shopping unless there is an emergency but will sit in the car and wait while his wife does the grocery shopping.  Additionally, the ALJ found that Swarnes goes to the bar where his wife works to drink and socialize.  Swarnes also testified that he visits friends and relatives, plays cards with them, and watches baseball games on TV with them.  Based upon these observations, it was appropriate for the ALJ to conclude that Swarnes's pain complaints were not fully credible.

**C.    Lack of Strong Pain Medications and Gaps in Medical Treatment**

Swarnes alleges that the ALJ did not consider that he had been severely limited in his ability to obtain medical care and medications due to lack of health insurance and finances. Swarnes argues that there is evidence within the record that supports this fact.

Here, the ALJ determined that Swarnes's use of medications does not suggest the presence of the severe pain alleged by Swarnes. AR 30. At the most recent hearing in June 2007, Swarnes testified that he was currently taking either Percocet or Vicodin for pain relief. AR 716. He stated that he takes one or the other every day, twice a day, and he thinks it is helping. AR 716. The ALJ noted that the prescription for Percocet was fairly new as it had been prescribed only two months prior to the hearing in April 2007. AR 716. A lack of strong pain medication is inconsistent with subjective complaints of disabling pain. See Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992). As such, the ALJ properly considered Swarnes's prescription medication related to pain relief in determining the credibility of Swarnes's pain complaints.

Further, the ALJ acknowledged that Swarnes had submitted very few, if any, medical records for treatment in 2004. After reviewing the record, the court is not aware of any medical records from 2004 that demonstrate medical treatment was sought or obtained. Instead, in 2004, Swarnes was

informed that he had reached maximum medical improvement, Swarnes filled out two disability report forms, Swarnes's sister completed a disability form on his behalf, Swarnes's wife completed a disability form regarding him, and Swarnes met with a vocational rehabilitation counselor. Even though Swarnes struggled financially, it is inconsistent with the degree of pain and disability asserted where no evidence exists that the claimant attempted to find any low cost or no cost medical treatment for alleged pain and disability. See Murphy, 953 F.2d at 386-87. Thus, the ALJ properly considered Swarnes's failure to seek medical treatment, specifically in 2004, despite the fact of Swarnes's financial issues.

## D. Reliance on Medical Evidence

Swarnes argues that the ALJ's reliance on the medical evidence to support his credibility finding was misplaced. Swarnes emphasizes that the most disabling factor in this claim is his pain, a factor not considered in the objective clinical finding relied upon by the ALJ. Swarnes points out that although Swarnes underwent three surgeries, doctors still noted that Swarnes was experiencing back pain.

The ALJ properly relied on medical evidence in addition to the other evidence discussed above when determining Swarnes was not fully credible. "The lack of supporting objective medical evidence may be used as 'one factor to be considered in evaluating the credibility of testimony and

32

complaints.' " <u>Curran-Kicksey v. Barnhart</u>. 315 F.3d 964, 968 (8th Cir. 2003). Here, the ALJ considered Swarnes's medical records from March 3, 2003, until Swarnes's most recent surgery in April 2007. More specifically, the ALJ discussed that in 2003, Swarnes received various treatments and underwent surgeries and that these procedures decreased Swarnes's pain. The ALJ also noted that Swarnes was 25 percent permanently partially disabled. The ALJ recognized that there were no medical records from 2004. The ALJ considered that a 2005 surgery and facet rhizotomy provided Swarnes some relief from pain. Further, the ALJ acknowledged that the 2006 examination demonstrated that Swarnes's back was in the same condition as previous exams and that there had been no change in his condition. The ALJ also discussed the DDS evaluators and their opinions as to Swarnes's functional capacity. Finally, the ALJ noted that Swarnes's April 2007 surgery was successful and that immediately after his surgery, his surgeon advised that he should not lift more than 10 pounds and should avoid activities that might require heavy and/or repetitive bending, squatting, twisting, and stooping. AR 31-35. Thus, the ALJ appropriately considered objective medical evidence that did not support Swarnes's subjective pain complaints as one factor to discount Swarnes's credibility.

### E.    Other Evidence Relied Upon By the ALJ

The ALJ relied upon other evidence not discussed above when determining that Swarnes was not entirely credible.  The ALJ noted that Swarnes could care for himself.  The ALJ also observed that Swarnes had run out of pain medications at the time of his July 2007 hearing and appeared to be functioning with over-the-counter medications.  The ALJ considered the fact that Swarnes alleged a complete inability to work but that since his alleged disability onset date, he had only attempted to return to his previous medium exertional level occupation and had never tried to work at any other job that was less physically demanding.  Additionally, the ALJ noted that Swarnes testified that when he was on medication, his pain level was a 5 or 6 out of 10.  Further, the ALJ discredited Swarnes's credibility by pointing out that Swarnes alleged he experienced side effects from his medication in his disability report but during all of his hearings, he admitted he did not experience any side effects from medication.  AR 30-31. The ALJ properly relied upon these facts in making his credibility determination.

Although the ALJ should have been more thorough in his reasoning for discounting Swarnes's credibility, "a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case." <u>Draper v. Barnhart</u>, 425

F.3d 1127, 1130 (8th Cir. 2005) (internal citations omitted).  Further, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001).  Even though this court may have decided this case differently, the court finds that the ALJ's determination that Swarnes was not fully credible is supported by substantial evidence.  Accordingly, the court finds the ALJ did not err in his credibility determination.

## II.     Failure to Fully and Fairly Develop the Record

Swarnes argues that the ALJ failed to obtain a consultative evaluation to determine the existence and severity of his borderline intellectual functioning.  Swarnes points out that the June 2004 vocational report reveals that the test scores reported indicate an IQ of 77.  Swarnes maintains that the ALJ failed to find that he has a severe mental impairment under the Social Security Act and failed to include any mental restrictions in his finding as to his RFC.

In his decision, the ALJ acknowledged that Swarnes's attorney had submitted an untimely request for a consultative mental status evaluation accomplished through WAIS testing.  The ALJ linked the request to Dr. Magrowski's report which stated that Swarnes's schools records

indicated that his graduation rank was 55 in a class of 58[11] and that his test scores on the GATB indicated he had an IQ of 77. The ALJ stressed that Swarnes had never asserted intellectual functioning or related disorder as being a severe impairment or disabling. Further, the ALJ noted that Swarnes did not testify regarding any difficulty in reading or comprehending and his attorney did not elicit testimony related to this topic. As such, the ALJ denied Swarnes's request for a consultative mental evaluation because it was untimely and neither objective medical evidence nor Swarnes's testimony supported the need for such a test. AR 34.

An ALJ has an obligation to investigate a claim not presented in the application for benefits when testimony at the hearing places him on notice of need for further inquiry. But an ALJ has "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993). Here, Swarnes did not initially allege a disability based on whole or in part on an IQ of 77 or borderline intellectual functioning. Swarnes also did not bring up the issue in his first administrative hearing in May 2006; however, his attorney did raise the issue a month after this hearing in June 2006. Although at the time of the

---

[11] The ALJ noted that he had not received a copy of these school records. AR 34.

April 2007 and June 2007 administrative hearings the ALJ was aware that a test score indicated Swarnes had an IQ of 77, neither Swarnes's attorney or Swarnes addressed this issue. Accordingly, no one testified at the hearings regarding Swarnes's IQ. The only medical evidence presented to support this impairment was an IQ test that was administered over twenty-five years earlier, which was found in Swarnes's school records. AR 476. Based upon these facts, the court finds that the ALJ did not have an obligation to inquire into Swarnes's IQ because neither he nor his attorney provided testimony elaborating on the accuracy of Swarnes's dated IQ test.

Further, the Commissioner is not required to accept a claimant's IQ score when it is inconsistent with the record. See Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004). Rather, the ALJ should examine the record to determine whether the proffered IQ score is reliable—that is, consistent with the claimant's daily activities and behavior. An ALJ may reject IQ scores if they are inconsistent with the record. Id. Here, the ALJ has evidence with which to find the IQ score was not reliable. For example, Swarnes represented that he graduated from high school and that he could read, write, and count change. Moreover, he was a heavy machine operator for close to 25 years and this job required him to unload barges, load dump trucks, and drive dump trucks. He represented that he had to use technical knowledge and skills to complete his job. Further, the fact he at one time

had a pilot's license for a tug boat and a driver's license demonstrate that the IQ results are inconsistent with his daily ability. Swarnes also testified that he plays cards and does word puzzles, which both require a certain amount of intelligence. Accordingly, the ALJ was not required to further develop the record in this case and his decision is supported by substantial evidence.

Based on the foregoing, it is hereby

ORDERED that the Commissioner's decision denying Swarnes's claim for Disability Insurance Benefits is affirmed.

IT IS FURTHER ORDERED that the Commissioner's decision denying Swarnes's claim for Supplemental Security income is affirmed.

Dated February 23, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE